UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LEE CONTRACTING, INC.,

               Plaintiff,                              Hon. Sally J. Berens

v.                                         Case No. 1:19-cv-831

SHORE WESTERN MANUFACTURING,
et al.,

               Defendants.

_____/


**OPINION REGARDING DEFENDANTS'
CORRECTED MOTION FOR PARTIAL DISMISSAL**

      Plaintiff Lee Contracting, Inc., (Lee) has sued Defendants Shore Western Manufacturing

(Shore), Nicholas Schroeder, and BIA West (BIA). In its Corrected First Amended Complaint,

Lee alleges state-law claims for breach of contract (Count I against Shore); unjust enrichment

(Count II against Shore); violation of the Michigan Building Contract Fund Act (MBCFA), Mich.

Comp. Laws § 570.151 *et seq.* (Count III against Shore and Schroeder); statutory conversion,

Mich. Comp. Laws § 600.2919a (Count IV against Shore and Schroeder); and relief pursuant to

the Michigan Uniform Voidable Transactions Act (MUVTA), Mich. Comp. Laws § 566.31 *et seq.*

(Count V against Shore, Schroeder and BIA). Lee's claims arise out of Shore's failure to pay Lee

for work that it performed as a subcontractor under Shore's contract with Western Michigan

University. Defendants move for partial dismissal pursuant to Federal Rules of Civil Procedure

12(b)(1), (2), and (6) arguing that: (1) the Court lacks personal jurisdiction over Schroeder and

BIA; (2) if the Court has personal jurisdiction over BIA, the Court lacks subject matter jurisdiction

over the case because there is no diversity of citizenship; and (3) Counts III and IV (violation of

MBCFA and statutory conversion) against Shore and Schroeder fail to state a claim.[1] (ECF Nos. 33 and 36.)

For the following reasons, the Court will **grant** the motion in its entirety.[2]

## I.   Background[3]

### A.   Facts

Lee is a Michigan corporation with its principal place of business in Pontiac, Michigan. Shore is a California corporation with its principle place of business in California. Schroeder, who was Shore's President during the time relevant to the claims in this case, is a resident of California. BIA is a Delaware corporation with its principal place of business in California. (ECF No. 20 at PageID.96.)

In February 2018, Jack Noren, of Noren and Associates Inc., acting as an agent for Shore, solicited a bid from Lee to perform certain work for Shore under a contract that Shore had with Western Michigan University (WMU). The proposed work, which was worth in excess of $50,000, entailed providing physical improvements to property that WMU occupied in Portage, Michigan. (*Id.* at PageID.97.) Shortly thereafter, Schroeder began dealing with Lee's agents and providing direction regarding the contents of the bid that Shore sought. Schroder also regularly communicated with WMU regarding quotes that Shore provided to WMU. (*Id.*; ECF No. 20-1.)

In April 2018, Lee submitted a proposal to Shore for performance of the proposed work, including labor, equipment, and materials, for the amount of $203,750.00 (the "WMU Test Frame"

---

[1] Although Lee and Defendants have requested oral argument, the Court determines that the parties' briefs have adequately developed the issues, and oral argument is unnecessary.

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the Court conduct all further proceedings in this case, including entry of judgment. (ECF No. 30.)

[3] The facts recited herein are taken from Lee's Corrected First Amended Complaint and attached exhibits (ECF No. 20), as well as the exhibits attached to the parties' briefs.

work). The bid included work on, or related to, foundations, HVAC, machining, piping, welding/fabrication and painting. Later that month, Shore, acting through Schroeder, accepted Lee's proposal for the WMU Test Frame work. Shortly thereafter, Schroeder sent an email to WMU and Lee indicating that he would be Shore's contact person for the WMU Test Frame work and requesting a list of people who should be included on future emails. (ECF No. 20 at PageID.98; ECF No. 20-4.)

In October 2018, after Lee had commenced the WMU Test Frame work, Shore requested another bid for additional work relating to the project. In response, Lee submitted a proposal to Shore for additional labor, equipment and materials, for the amount of $2,800.00. Schroeder accepted the bid on behalf of Shore the same day. (ECF No. 20 at PageID.99.) On November 29, 2018, shortly before it completed its work under both subcontracts, Lee sent an invoice to Shore for $203,750.00. In January 2019, after it completed all of its work under the subcontracts, Lee sent Shore an additional invoice for $2,800.00. (*Id.*)

When Shore failed to pay the invoices, Lee began pressing Shore for payment. In January 2019, a Shore representative sent an email to Lee acknowledging the legitimacy of Lee's invoices and explaining that payment was being delayed due to a pending corporate restructuring. In March 2019, however, Schroeder filed a form SI-550 with the Secretary of State for California continuing to identify Shore as a California corporation and Schroeder as its President. (*Id.* at PageID.19–20.)

In April 2019, BIA was formed as a Delaware corporation. On May 28, 2019, BIA filed a Statement and Designation by Foreign Corporation with the California Secretary of State listing 225 Duarte Road, Monrovia, California as its principal executive office in California. The form also identified 50144 Bethesda Court, Shelby Township, Michigan, as BIA's Principal Executive Office. (ECF No. 20-11.) On September 27, 2019, BIA filed a Statement of Information with the

California Secretary of State listing 50144 Bethesda Court, Shelby Township, Michigan, as the address of its principal executive office and its Chief Executive Officer, Secretary and Chief Financial Officer. (ECF No. 38-2.)

On October 2, 2019, Lee sent a demand to Shore for the unpaid invoices plus accrued services charges, but Shore refused to pay. Shortly thereafter, Schroeder and Shore owner Donald Schroeder advised a Lee representative that they did not dispute the outstanding amounts that Lee sought. However, they said that Shore could not afford to pay because it had transferred all of its assets to BIA. On October 14, 2019, Schroeder followed up with an email to Lee explaining that Shore had run into financial difficulty in early 2019 and thus had entered into an agreement with BIA, pursuant to which BIA acquired Shore's assets, hired its employees, and took over its operations as new company. Schroeder also said that, because the agreement called for BIA to pay Shore after the third year of operation based on the value of BIA at that time, Shore was asking its creditors to accept a three-year payment plan with a final payment after the three-year earnout payment from BIA. (*Id.* at PageID.100–01.)

### B.    Procedural History

Lee filed its complaint in this case on October 11, 2019, against Shore and Schroeder asserting all of the above-described claims except the MUTVA claim. On December 13, 2019, Defendants requested a pre-motion conference before Judge Neff. In their filing, Defendants indicated that they intended to move for dismissal of Schroeder for lack of personal jurisdiction and dismissal of Counts III and IV as to both Defendants. (ECF No. 8.) On January 24, 2020, Judge Neff held a pre-motion conference, during which Lee indicated its intention to amend its complaint. (ECF No. 15.) On January 29, 2020, BIA filed a Statement of Information with the California Secretary of State changing the address of its principal executive office, Chief Executive Officer, Secretary and Chief Financial Officer to the Monrovia, California address identified in the

4

May 28, 2019 filing. (ECF No. 37-3.) Lee filed its First Amended Complaint adding BIA and the MUTVA claim, and its Corrected First Amended Complaint on February 3, 2020. (ECF Nos. 16 and 20.)

## II.   Analysis

### A.   Personal Jurisdiction

As the plaintiff, Lee bears the burden of showing that the Court has personal jurisdiction over Schroeder and BIA. *International Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir. 1997). "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). Where a motion to dismiss for lack of personal jurisdiction is decided without an evidentiary hearing, the plaintiff need only make out a prima facie showing of personal jurisdiction. *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (quoting *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)). This burden is "relatively slight." *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 169 (6th Cir. 1988)). A court must construe pleadings and affidavits in the light most favorable to the party asserting personal jurisdiction. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002).

Personal jurisdiction may be of two types, general or specific. *Daimler AG v. Bauman*, 571 U.S. 117, 128 (2014). General jurisdiction exists where the defendant has "continuous and systematic" contacts with the forum state, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011), such that it should "reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a

different state." *Bristol-Myers Squibb Co. v. Superior Court. of Cal.,* __ U.S. __, 137 S. Ct. 1773, 1780 (2017). Specific, or limited, jurisdiction derives from the facts of the case. That is, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* (quoting *Goodyear*, 564 U.S. at 919). A federal court may exercise personal jurisdiction over an out-of-state defendant only if the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Millken v. Meyer*, 311 U.S. 457, 463 (1940)). Assessing the existence of jurisdiction involves a two-part process: "(1) first, the court must determine whether any of Michigan's relevant long-arm statutes authorize the exercise of jurisdiction over Defendants; and, if so, (2) the court must determine whether exercise of that jurisdiction comports with constitutional due process." *Air Prods. & Controls, Inc.*, 503 F.3d at 550.

### 1. BIA

The Court first considers whether it has personal jurisdiction over BIA. Lee contends that the Court may exercise general jurisdiction over BIA.[4] Michigan courts have general jurisdiction over a corporation when any of the following criteria is met: (1) the corporation is incorporated in Michigan; (2) the corporation consents to jurisdiction in a Michigan court; or (3) the corporation carries on "a continuous and systematic part of its general business within the state." Mich. Comp. Laws § 600.711. Defendants argue that the Court has no basis to exercise general jurisdiction over

---

[4] Lee does not argue that the Court has specific jurisdiction over BIA. Accordingly, it has waived that argument. *See Knowles v. Iowa*, 525 U.S. 113, 116 n.2 (1998) (noting that the State of Iowa waived an argument by failing to raise it in its brief in opposition to the petition for certiorari in the habeas proceeding); *Keys v. Dart Container Corp. of Ky.*, No. 1:08-CV-138, 2012 WL 2681461, at *7 (W.D. Ky. July 6, 2012) (holding that "a non-moving party waives an argument by failing to address [an] argument in its response brief").

BIA because it is neither incorporated, nor has its principal place of business, in Michigan and, therefore, cannot be considered "at home" in Michigan in accordance with the Supreme Court's more recent cases. (ECF No. 37 at PageID.220–21.) Lee counters that the Court may properly exercise general jurisdiction over BIA because its May 28, 2019 and September 27, 2019 filings with the California Secretary of State show that its principal executive office was in Michigan at the time of the voidable transactions at issue in the MUTVA claim. (ECF No. 38 at PageID.263–64.) Because BIA is a Delaware corporation with its principal place of business in California, the Court's inquiry focuses on the second prong of the jurisdictional analysis.

For decades following *International Shoe*, courts applied the "continuous and systematic" test to ascertain the existence of general jurisdiction. *See*, *e.g.*, *Conn v. Zakharov*, 667 F.3d 705, 713 (6th Cir. 2012) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16 & n.9 (1984)); *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989). This test no longer suffices, as the Court's more recent decisions in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011), and *Daimler AG v. Bauman*, 571 U.S. 117 (2014), substantially cabined the scope or availability of general jurisdiction. *See BNSF Ry. Co. v. Tyrrell*, __ U.S. __, 137 S. Ct. 1549, 1560 n.1 (2017) (Sotomayor, J., concurring in part and dissenting in part) (noting that "*Daimler*, and its predecessor *Goodyear* . . . wrought . . . [a] sea change" in the law of general jurisdiction). In *Goodyear*, the Court noted that under *International Shoe*, "[a] corporation's 'continuous activity of some sorts within a state,' . . . 'is not enough to support the demand that the corporation be amenable to suits unrelated to that activity.'" 564 U.S. at 927 (quoting *International Shoe*, 326 U.S. at 318). Rather, the Court said, a court may exercise general jurisdiction over corporations only "when their affiliations with the State are so 'continuous and systematic' as to render them essentially *at home* in the forum State." *Id.* at 919

7

(italics added). The Court further explained that "the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* at 924. In *Daimler*, the Court elucidated the "at home" test as it relates to corporations: "With respect to a corporation, the place of incorporation and principal place of business are 'paradig[m] . . . bases for general jurisdiction[,]' [and] have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." 571 U.S. at 137 (citation omitted). The Court observed that such bases promote predictability because they "afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims." *Id.*

Although *Goodyear* and *Daimler* do not limit the bases for general jurisdiction over a corporation to its principal place of business or State of incorporation, an "exceptional case" must be shown beyond those two jurisdictional bases. *Id.* at 139 n.19 ("We do not foreclose the possibility that in an exceptional case a corporation's operations in a forum other than its principal place of business may be so substantial and of such a nature as to render the corporation at home in that State."); *see also Kipp v. Ski Enter. Corp. of Wis., Inc.*, 783 F.3d 695, 698 (7th Cir. 2015) (noting that, "it is fair to say, [*Goodyear* and *Daimler*] raised the bar for . . . [general] jurisdiction"). The only case the Court has identified thus far as "exceptional" is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952)—a World-War-II-era case. The defendant in *Perkins* was a mining company that operated in the Philippine Islands. After the Japanese occupied the Philippines, the company halted its mining operations and moved its offices to Ohio, where its president/general manager/principal stockholder kept the company's files, corresponded regarding the company's business and to its employees, held directors meetings and supervised policies pertaining to the rehabilitation of the company's properties in the Philippines. In short, "he carried

8

on in Ohio a continuous and systematic supervision of the necessarily limited wartime activities of the company." *Id.* at 448. The Court concluded that under the circumstances, Ohio would not violate due process by entertaining a suit against the company based on events arising outside of Ohio. *Id.*

Although Lee admits that Michigan is not one of the paradigmatic forums in which BIA could be considered "at home" for purposes of general jurisdiction, it argues that this case qualifies as "exceptional" because it is analogous to *Perkins* in that, according to BIA's California filings, BIA maintained its "Principal Executive Office" in Michigan for nine months, including during the time of the voidable transfer of assets in California. (ECF No. 38 at PageID.263–64.) But there are important distinctions between this case and *Perkins*. First, unlike the company in *Perkins*, BIA has a separate principal place of business located outside the forum in which general jurisdiction is sought. As the Supreme Court later recognized, in *Perkins*, "Ohio was the corporation's principal, if temporary, place of business so that Ohio jurisdiction was proper even over a cause of action unrelated to the activities in the State." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779–80 n.11 (1984). Second, at the time suit was filed in *Perkins*, the company was still carrying on a "continuous and systematic, but limited," part of its business in Ohio. 342 U.S. at 414–15. Here, at the time Lee filed its amended pleading adding BIA, BIA had changed the address of its "Principal Executive Office"—the only thing connecting BIA to Michigan—to the California address. Relatedly, the company's president in *Perkins* was served in Ohio, *see id.*, while in this case, Lee served BIA at its principal place of business in California. (ECF No. 22-1.) Finally, in contrast to *Perkins*, there is no indication that anyone acting on behalf of BIA in Michigan carried on a "continuous and systematic supervision" of BIA's activities in California or elsewhere. 342 U.S. at 448. Moreover, the record in this case does not show that BIA's activities

in Michigan are so "continuous and systematic" as to render it at home in Michigan. *Goodyear*, 564 U.S. at 919. According to Faycal Namoun, BIA's President, BIA's revenue to date from jobs performed in Michigan is only 2.46% of its total revenue. (ECF No. 37-2.) Although "the general jurisdiction inquiry does not focus solely on the magnitude of the defendant's in-state contacts," *BNSF Ry. Co.*, 137 S. Ct. at 1559 (internal quotation marks omitted), it is part of the inquiry, which "calls for an appraisal of a corporation's activities in their entirety." *Id.* (internal quotation marks omitted). Under the Supreme Court's current general jurisdiction jurisprudence, Lee has not shown that BIA is "at home" in Michigan.

Accordingly, Lee fails to sustain its burden of showing that the Court has personal jurisdiction over BIA. Thus, the Court need not address Defendants' subject matter jurisdiction argument.

### 2.    Schroeder

There is no dispute that the Court has personal jurisdiction over the claims against Shore and that Counts I and II for breach of contract and unjust enrichment are asserted solely against Shore. There is also no question that in dealing with Lee in soliciting and negotiating the subcontracts with Lee, Schroder was acting on behalf of Shore. Schroeder contends, however, that the Court lacks personal jurisdiction over the claims that Lee alleges against him individually.

When analyzing personal jurisdiction, a court must ensure that jurisdiction exists "over each defendant and as to each asserted claim." *Board of Forensic Document Exam'rs, Inc. (BFDE) v. Am. Bar Ass'n*, No. 16-cv-2631, 2017 WL 549031, at *3 (W.D. Tenn. Feb. 9, 2017) (citing *SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 220 (6th Cir. 2009) (White, J., concurring)); *see also Salom Enters., LLC v. TS Trim Indus., Inc.*, 464 F. Supp. 2d 676, 685 (E.D. Mich. 2006) (noting that, although the Sixth Circuit had not addressed the issue, other

jurisdictions had held that "the exercise of limited personal jurisdiction over a defendant is claim specific").

As already noted, the exercise of jurisdiction over a non-resident defendant comports with due process if the defendant has "certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co.*, 326 U.S. at 316 (internal quotation marks omitted). To satisfy the minimum contacts inquiry, the plaintiff must demonstrate that "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). That is, a defendant must have a relationship with the forum that "arise[s] out of contacts that the 'defendant *himself*' create[d] with the forum State." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

In deciding whether the exercise of personal jurisdiction would offend due process, the Sixth Circuit applies the following three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

Defendants argue that Schroeder is not subject to jurisdiction in Michigan because he did not purposefully avail himself of the privilege of acting in the state. Purposeful availment ensures that the defendant has purposefully established a connection with the forum "such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). It "'is something akin to a deliberate undertaking to do or cause an act or thing to be done in Michigan or conduct which can be properly regarded as a prime generating

cause of the effects resulting in Michigan, something more than a passive availment of Michigan opportunities.'" *Neogen Corp.*, 282 F.3d at 891 (citation omitted). Requiring an out-of-state defendant to avail itself purposefully of the privilege of acting in the forum state protects the defendant from being subjected to suit based solely on "'random,' 'fortuitous,' or 'attenuated' contacts, or [because] of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (citations omitted).

Defendants note that in dealing with Lee, Schroeder did not travel to Michigan, he sent emails from California, and directed work under and administered Shore's contracts with Lee (and WMU) from California. They argue that these acts are insufficient to support jurisdiction over Schroeder. Defendants cite *SFS Check, LLC v. First Bank of Delaware*, 774 F.3d 351 (6th Cir. 2014), as analogous to this case. There, the Sixth Circuit held that the defendant bank's vice president for e-commerce's acts of participating in two phone calls were insufficient to subject him to personal jurisdiction in Michigan, even though the Michigan court had personal jurisdiction over the bank. The court observed that the first phone call arose from the plaintiff's "unilateral act" of placing the call from Michigan to the bank's vice president in Delaware, and the information the vice president provided in the second phone call (returning an earlier phone call from the plaintiff) was accurate. *Id.* at 356. The court further noted that the injury the plaintiff claimed had occurred even prior to the first phone call. *Id.* at 357. Defendants contrast *SFS Check* with *MAG IAS Holdings, Inc. v. Schmuckle*, 854 F.3d 894 (6th Cir. 2017), in which the Sixth Circuit held that the defendant, who was formerly employed by the plaintiff as a high-level executive, had sufficient contacts with Michigan to support personal jurisdiction based on his control and management of the day-to-day operations of the plaintiff's Michigan subsidiary, his

visits to Michigan during his tenure as an officer and his weekly contacts with Michigan employees by email and phone. *Id.* at 897–98, 901–02.

Lee counters that the fact that Schroeder was not physically present in Michigan does not preclude the exercise of personal jurisdiction because his communications from California with Lee regarding the work in Michigan under the subcontracts, in which he personally provided details for the proposals from Lee, personally approved the proposals, and personally provided project management and direction once Shore accepted the proposals, suffice to establish the necessary minimum contacts to justify subjecting Schroeder to personal jurisdiction in Michigan. Lee cites *Neal v. Janssen*, 270 F.3d 328 (6th Cir. 2001), as supporting its argument. In *Neal*, the Tennessee plaintiffs alleged that the defendant, a citizen of Belgium had committed fraud and breach of fiduciary duty based on misrepresentations he made regarding the value of a "dressage horse." The plaintiffs had retained the defendant to sell the horse in the Netherlands. The defendant made several phone calls and sent facsimiles to the plaintiffs in Tennessee on several occasions, including a call in which the defendant represented that the plaintiffs had placed an unrealistically high value on the horse, which ultimately led the plaintiffs to approve a sale at a lower price. Following the sale, the plaintiffs learned that the defendant had sold the horse for a much higher price and had retained the difference. *Id.* at 330. The court held that the defendant's "actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were directed at individuals in Tennessee" and were "the heart of the lawsuit . . . [,] not merely incidental communications sent by the defendant into Tennessee." *Id.* at 332. The court also held that the communications satisfied *Mohasco*'s second requirement because the defendant's false communications directed to the plaintiffs gave rise to their tort claims. *Id.* at 332–33.

Here, Schroeder's acts that Lee cites pertain to the formation and execution of Shore's subcontracts with Lee. Had Lee alleged that Schroeder was personally liable on those contracts and sued Schroeder under Counts I and II, Schroder's contacts with Michigan could arguably subject him to personal jurisdiction in Michigan on those claims. Counts I and II, however, are solely against Shore. As for the MBCFA claim in Count III, the MBCFA-dependent conversion claim in Count IV and the MUVTA claim in Count V, all of Schroeder's pertinent acts occurred in California. To establish a claim under the MBCFA, "a plaintiff need only show that the contractor received payment for building construction purposes and that the contractor retained or used those funds 'for any other purpose than to first pay laborers, subcontractors and materialmen, engaged by him to perform labor or furnish material for the specific improvement . . . .'" *DiPonio Constr. Co. v. Rosati Masonry Co.*, 246 Mich. App. 43, 52 (2001) (quoting Mich. Comp. Laws § 570.152). Lee does not allege that Shore/Schroeder received payment of the WMU contract funds in Michigan or that it/he used those alleged trust funds to pay unauthorized debts in Michigan. In short, Lee fails to identify any contact that Schroeder had with Michigan that gives rise the MBCFA claim because it is the receipt *and* improper usage of alleged trust funds that gives rise to the claim. *See id.* at 67 (a claim under the MBCFA accrues when the defendant appropriates funds received as payment on a specific project without first using them to pay laborers, subcontractors or materialmen). This case is thus distinguishable from *Neal* because Schroeder's communications with Lee's representatives in Michigan did not give rise to the MBCFA and conversion claims against Schroeder. Moreover, the fact that Lee experienced an injury in Michigan from Schroeder's alleged MBCFA/conversion/MUVTA activity in California is insufficient to connect Schroeder to Michigan. *See Walden v. Fiore*, 571 U.S. 277, 290 (2014) ("The proper question is not where the

plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.")

Accordingly, Schroeder will be dismissed from the case for lack of personal jurisdiction.

### B.     Motion to Dismiss for Failure to State a Claim

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim must be dismissed for failure to state a claim on which relief may be granted unless the "[f]actual allegations [are] enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007). As the Supreme Court more recently held, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." If the complaint simply pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*  As the Court further observed:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

*Id.* at 678-79 (internal citations omitted).

### 1.      MBCFA Claim

Defendants argue that Lee's MBCFA claim is subject to dismissal because the MBCFA does not apply to public construction contracts. The Court agrees.

The MBCFA, also referred to as the Michigan Builders Trust Fund Act, imposes a "'trust' upon the building contract fund paid by any person to a contractor or subcontractor." *Carlisle Cashway, Inc. v. Johnson* (*In re Johnson*), 691 F.2d 249, 252 (6th Cir. 1982). The Act provides, in pertinent part:

> In the building construction industry, the building contract fund paid by any person to a contractor, or by such person or contractor to a subcontractor, shall be considered by this act to be a trust fund, for the benefit of the person making the payment, contractors, laborers, subcontractors or materialmen, and the contractor or subcontractor shall be considered the trustee of all funds so paid to him for building construction purposes.

Mich. Comp. Laws § 570.151. Although the MBCFA is a criminal statute that does not provide for a civil cause of action, the Michigan Supreme Court has recognized a civil remedy for its enforcement. *See National Bank of Detroit v. Eames & Brown*, 396 Mich. 611, 621 (1976); *B.F. Farnell Co. v. Monahan*, 377 Mich. 552, 555 (1966).

The Michigan Supreme Court first held that the Act does not apply to public construction projects in *Club Holding Co. v. Flint Citizens Loan & Investment Co.*, 272 Mich. 66 (1935), stating that "we cannot presume, in the absence of explicit language, that it was intended to apply to the erection of public buildings or to public works." *Id.* at 72. *Club Holding* was subsequently overruled on other grounds by *B.F. Farnell Co. v. Monahan*, 377 Mich. 552 (1966). Nonetheless, *Club Holding* remained good law as to whether the Act covered public construction projects. The court reaffirmed this ruling in *National Bank of Detroit v. Eames & Brown*, 396 Mich. 611 (1976), noting that "[t]he purpose of the Act is to create a trust fund for the benefit of materialmen and others under private construction contracts." *Id.* at 622.

16

The Sixth Circuit has twice addressed the issue. First, in *General Insurance Co. of America v. Lamar Corp.*, 482 F.2d 856 (6th Cir. 1973), the court observed that *B.F. Farnell* did not disturb "any pronouncements in *Club Holding* that do not concern the creation of a civil remedy by the Act." *Id.* at 860. The court thus concluded that it was bound to follow *Club Holding*'s construction that "the Act does not make funds paid on public projects a trust fund in the hands of a contractor." *Id.* The court reasoned that those who supplied labor and materials on public projects were protected by statutorily-required payment and performance bonds. *Id.* Subsequently, in *Parker v. Klochko Equipment Co.*, 590 F.2d 649 (6th Cir. 1979), another Sixth Circuit panel, determining that the discussion of the Act in *General Insurance* was dicta and that the statement in *Club Holding* that the Act does not apply to public projects was dicta as well, held that the Act applies to public construction projects. *Id.* at 653. Two years later, in response to a certified question from the Eastern District of Michigan regarding the Act's applicability to public contracts, the Michigan Supreme Court held that the Act does not apply to public construction projects. *See In re Certified Question from the United States District Court for the Eastern District of Michigan*, 411 Mich. 727, 732 (1981). The court reaffirmed its rulings in *Eames & Brown* and *Club Holding* and said that the Sixth Circuit in *General Insurance* accurately summarized the reason for differentiating between private and public construction contracts. *Id.* at 732–34. Subsequent to *In re Certified Question*, every state and federal court that has considered the issue has held that the Act does not apply to public construction contracts. *See Midwest Eng'g v. SWS Eng'g*, No. 254148, 2005 WL 1459613, at *2 (Mich. Ct. App. June 21, 2005) (per curiam); *Ingham Cty. v. Strojny* (*In re Strojny*), 337 B.R. 150, 157 (Bankr. W.D. Mich. 2006); *Shapiro v. Jacob's Elec. Constr., Inc.* (*In re Eastern Concrete Paving Co.*), 293 B.R. 704, 706 n.1 (Bankr. E.D. Mich. 2003); *Merchants Bonding Co.*

*v. Utica Cmty. Schs.*, No. 01-60194, 2003 WL 21456626, at *3 (E.D. Mich. May 2, 2003); *In re V. Pangori & Sons, Inc.*, 53 B.R. 711, 722 (E.D. Mich. 1985).

Lee urges the Court to disregard *In re Certified Question* and the other cases following that decision, noting that multiple Michigan Supreme Court justices have questioned the propriety of the certification procedure. Instead, it urges the Court to follow the Sixth Circuit's decision in *Parker*. The Court declines the invitation. As a federal court sitting in diversity, this Court is obligated to apply Michigan law as determined by the Michigan Supreme Court and, absent a relevant case from that court, to determine Michigan law "from all available data." *Bailey v. V&O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985). Sources of relevant data include, among other things, the state supreme court's dicta and intermediate appellate court decisions. *See Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). Although the Court considers *In re Certified Question* binding, even if it is not, it is precedent that the Court may consider, along with the Michigan Supreme Court's statements in *Eames & Brown* and *Club Holding*, which convincingly establish that the Act does not apply to public construction projects.

Lee argues that there is no basis for dismissal, even if the Court concludes that the Act does not apply to public construction projects, because Defendants cannot point to undisputed facts supporting their contention that the WMU project involved a public construction contract. Citing *Midwest Eng'g v. SWS Eng'g*, No. 254148, 2005 WL 1459613, at *2 (Mich. Ct. App. June 21, 2005) (per curiam), Lee argues that the "public works" nature of a contract is an affirmative defense that a defendant must establish against a claim under the Act, and because that is so, the Court must accept as true Lee's allegation in its complaint that Shore's failure to obtain bonds for the project is evidence that it was not a "public works" project. (ECF No. 38 at PageID.271 (citing ECF No. 20 at PageID.101).) In other words, Lee argues that because the corrected amended

complaint does not admit facts establishing the "public works" affirmative defense, dismissal under Rule 12(b)(6) is improper. Defendants acknowledge that the Act does not define "public construction project" or "public work," and no Michigan court has defined those terms in connection with Act. Defendants argue, however, whether a construction contract is public presents a pure issue of law that a court may determine by considering Michigan constitutional and statutory provisions governing the entity, as well as other cases in which similar entities' contracts have been held beyond the scope of the Act. (ECF No. 37 at PageID.229–31.)

The Court concludes that the public nature of a construction contract is an issue of law that a court may decide. Although the Act does not define a "public works contract" or "public construction contract," and Michigan case law does not inform the issue, common sense suggests that a construction contract entered into by an entity created and governed by state law and supported by state funds qualifies as a public construction contract for purposes of the Act. Pursuant to statute, WMU is one of four state universities governed by eight-member boards of control, the members of which are appointed by the governor with the advice and consent of the senate. Mich. Comp. Laws § 390.551. Such boards must conduct their meetings in compliance with Michigan's Open Meetings Act, Mich. Comp. Laws § 15.261 *et seq.* Mich. Comp. Laws § 390.554. Pursuant to Article VIII, Section 4 of the Michigan Constitution, the legislature must appropriate moneys to maintain WMU and other state universities, which in return must provide the legislature an annual accounting of all income and expenses. WMU is authorized to acquire property by eminent domain pursuant to Mich. Comp. Laws § 213.21 *et seq. See Western Mich. Univ. Bd. of Trs. v. Slavin*, 381 Mich. 23, 25 (1968). WMU is also subject to the Michigan Public Works Act (PWA), Mich. Comp. Laws § 129.201, which requires a principal contractor on a contract exceeding $50,000 for the construction, alteration or repair of any public building or

public work or improvement to post performance and payment bonds before entering the contract. *See W.T. Andrew Co. v. Mid-State Sur. Corp.*, 450 Mich. 655, 668 (1996) (holding that the University of Michigan was subject to "the public works bond statute"). In addition, WMU is subject to Michigan's Freedom of Information Act, Mich. Comp. Laws § 15.231 *et seq. See Herald Co. v. Eastern Mich. Univ. Bd. of Regents*, 475 Mich. 463 (2006). Finally, courts have found construction contracts with a local school district and a city not subject to the Act. *See General Ins. Co.*, 482 F.2d at 857–58, 860; *Merchants Bonding Co.*, 2003 WL 21456626, at *3.

In light of the foregoing, there is no room to argue that a contract with a Michigan public university for the construction of a building or an improvement does not constitute a public construction contract. Moreover, Lee fails to explain how Shore's contract with WMU could be considered a private contract.

Finally, Lee argues, if the contract between Shore and WMU is a public construction contract, the Court should consider an "exception to the exception" based on Shore's failure to comply with the PWA's requirement to obtain the required performance and payment bonds for the project. (ECF No. 38 at PageID.272–73.) Lee notes that, because the rationale for excluding public construction projects from the MBCFA is that subcontractors are protected from non-payment by the required bonds, an exception to the rule excluding public contracts from the scope of the MBCFA is justified when the contractor fails to provide the bonds.

The statute provides, in relevant part:

Before any contract, exceeding $50,000.00 for the construction, alteration, or repair of any public building or public work or improvement of . . . a . . . public educational institution . . . the proposed contractor, hereinafter referred to as the "principal contractor," shall furnish at his or her own cost to the governmental unit a performance bond and a payment bond which shall become binding upon the award of the contract to the principal contractor.

Mich. Comp. Laws § 129.01. Upon application, the governmental unit must provide a certified copy of the bond to anyone who has supplied labor or materials for the work but has not received payment. The certified copy is deemed "prima facie evidence of the contents, execution, and delivery of the original." Mich. Comp. Laws § 129.208. The Michigan Court of Appeals has held that this statute does not impose "a broad duty of the government unit to require the bonds or be liable for parties injured by the failure to require bonds." *ABC Supply Co. v. City of River Rouge*, 216 Mich. App. 396, 402 (1996) (citing *Kammer Asphalt Paving Co. v. East China Twp. Schs.*, 443 Mich. 176, 184–85 (1993)). Instead, the government entity is deemed to confirm the validity of a bond only when the subcontractor requests a certified copy of the bond. *Id.* (citing *Kammer*, 443 Mich. at 184). By making such inquiry, a subcontractor—such as Lee in this case—can protect itself by requesting a certified copy of the performance bond as specified in Mich. Comp. Laws § 129.208. Lee does not allege that it availed itself of this procedure, which would have provided it protection from non-payment.

Accordingly, the Court finds no basis to recognize the exception Lee proposes.

### 2. Conversion Claim

Finally, Defendants argue that Lee's conversion claim is subject to dismissal because Lee cannot show that it had a right to the specific funds that Shore received from WMU under the construction contract. "Conversion may occur when a party properly in possession of property uses it in an improper way, for an improper purpose, or by delivering it without authorization to a third party." *Department of Agric. v. Appletree Mktg.*, 485 Mich. 1, 14 (2010). When the property is money, the defendant must have an obligation to return the specific money entrusted to his or her care, and the defendant must have obtained the money without the owner's consent to the creation of a debtor and creditor relationship. *Head v. Phillips Camper Sales & Rental, Inc.*, 234 Mich. App. 94, 111–12 (1999). As Lee admits, its conversion claim depends on its allegation that

the contract funds Shore received from WMU were trust funds under the MBTFA that Shore held for Lee's benefit. Because the Court has determined that Lee's MBTFA claim is properly dismissed, its conversion claim fails as well.

### III.   Conclusion

For the foregoing reason, the Court will **grant** Defendants' Corrected Motion for Partial Dismissal. (ECF No. 36.) Accordingly, Defendants BIA and Schroeder will be dismissed from the case without prejudice for lack of personal jurisdiction. Counts III and VI will be dismissed for failure to state a claim.

An Order consistent with this Opinion will enter.

Dated: October 22, 2020                     /s/ Sally J. Berens
                                          SALLY J. BERENS
                                          U.S. Magistrate Judge